# EXHIBIT 3

JAMS
NEW YORK, NEW YORK

-------------------------------------------------------------x

National Football League Players Association,
National Football League Players Incorporated,
and OneTeam Partners, LLC,

           Claimants,          JAMS
                                          ARBITRATION 5425003028

   v.

Saber Interactive Inc.

           Respondent.

-------------------------------------------------------------x

### INTERIM AWARD

**Counsel:**

David L. Greenspan, Esq.
Sarah L. Viebrock, Esq.
Laura Toland, Esq.
Neha Vyas, Esq.

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Counsel for Claimants

Patrick D. Bonner, Esq.
Lindsay T. Weibel, Esq.

Menz Bonnet Komar & Konigsberg LLP
125 Half Mole Road, Suite 200
Red Bank, NJ
Counsel for Respondent

**Place of Arbitration:** New York, New York

WE, THE UNDERSIGNED PANEL ARBITRATORS, having been designated in accordance with Paragraph 10 (B) of the License Agreement signed between Claimants and Respondent on May 23, 2023, and a Demand for Arbitration at JAMS by Claimants, filed November 19, 2024, and having examined the submissions, proof and allegations of the parties as contained in and as limited to their JAMS Comprehensive Rule 18 Motions for Summary Disposition, find, conclude and issue this INTERIM AWARD as follows:

**Claimants' Cross-Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 on Claimants' Causes of Action 1 and 4 (as limited by the Parties' papers to Count One Breach of Contract only) is GRANTED; Claimants' Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 to Dismiss Respondent's Counterclaims on the Merits is GRANTED; Claimants' Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 to Dismiss Respondent's Counterclaims as a Sanction is DENIED as MOOT; Respondent's Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 on Claimants' Causes of Action 1 and 4 (as limited by the Parties' papers to Count One Breach of Contract only) is DENIED with prejudice; Respondent's Request that Claimants' Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 to Dismiss Respondent's Counterclaims on the Merits is DENIED with prejudice; and Respondent's Request that Claimants' Motion for Summary Disposition pursuant to JAMS Comprehensive Rule 18 to Dismiss Respondent's Counterclaims as a Sanction is DENIED as MOOT.**

I.    Introduction and Procedural Statement

Introduction

On May 23, 2023, Claimants, National Football League Players Association ("NFLPA"), National Football League Players Incorporated ("NFLPI"), and One Team Partners, LLC, ("One Team"), (the "NFLPA Licensors" or "Claimants"), and Respondent, Saber Interactive Inc., ("Saber"), a worldwide video game publisher and developer, entered into a License Agreement whereby Saber acquired from the NFLPA Licensors the right to include NFL players' names, images, likenesses and jersey numbers in an

2

arcade-style football video game, Wild Card Football, published by Saber. In exchange for the right to use the NFL Intellectual Property, Saber committed to pay the NFLPA Licensors royalties based on the sales of the game, subject to "Minimum Guarantee Payments", as well as minimum "Marketing Commitments" of funds by Licensee Saber for activations and endorsements performed by NFL players in support of the Licensed Product.

In this Arbitration, Claimants allege that Respondent failed to make certain Minimum Guarantee Payments as well as Marketing Commitment Payments. Additionally, Claimants assert that following the September 30, 2024, issuance by the NFL Licensors of a Notice of Termination, Saber refused to take steps to stop further sales of Wild Card Football until October 31, 2024, and the game is still live on many platforms and claimed to be "Officially Licensed."

In their Demand for Arbitration, Claimants advance four Causes of Action. The First Cause of Action alleges Breach of Contract based on Respondent's purported refusal to pay amounts owed to Claimants under the License Agreement. The Second Cause of Action alleges Trademark Infringement, False Designation of Origin, False Endorsements, False Advertising and Passing Off under the Lanham Act, based on Respondent's purported refusal to take timely steps to stop further sales of the video game, the continued presence of the game on many platforms, and Respondent continuing to hold itself out as an authorized licensee. The Third Cause of Action alleges Misappropriation of Rights of Publicity based on Respondent's purportedly using NFL player names, likenesses, jersey numbers and other identifying attributes while continuing to sell and advertise the game as "Officially Licensed" by Claimants after

3

Claimants had terminated the License Agreement. The Fourth Cause of Action seeks a Declaratory Judgment that Claimants properly terminated the License Agreement; that Respondent breached the License Agreement by failing to make payments owed to Claimants under the License Agreement prior to and following Claimants' termination of the License Agreement and continuing to use Claimants' intellectual Property after termination; that Respondent misappropriated Claimants' intellectual property rights; and that Respondent violated the rights of publicity of NFL players, which have been assigned to Claimants for group licensing programs.

In its Amended Response, Respondent asserts that it acted reasonably and is not liable for unauthorized sales of the game or use of Claimants' intellectual property following termination of the License Agreement. Respondent offers a legal interpretation of the License Agreement contrary to that advanced by the Claimants and argues that it is not liable for any additional "Minimum Guarantees" or "Marketing Commitments". In counterclaims, Respondent additionally asserts Breach of the Duty of Good Faith and Fair Dealing, Breach of Contract and Fraud in the Inducement and seeks recission of the License Agreement and the return of all funds paid pursuant to the License Agreement.

Procedural Statement

Pursuant to Section 10 B of the License Agreement, this Arbitration is conducted pursuant to the JAMS Comprehensive Arbitration Rules and Procedures; the substantive law of the State of New York governs this dispute.

The Arbitration Panel held a Preliminary Conference on March 12, 2025. Status Conferences were thereafter held on April 15, 2025, June 13, 2025, and July 17, 2025.

4

The Panel propounded questions to the Parties concerning the status of Discovery and subsequently directed further explanation. In the course of Discovery, the Parties jointly requested permission to brief what they acknowledge is the "core issue" in this Arbitration and contend can be resolved as a matter of law without an evidentiary hearing. The Parties were granted permission to brief the following question: What if any monies are owed to Claimants pursuant to the Minimum Guaranteed Payments provision of the License Agreement? The substance of the Conferences as well as procedural matters and decisions were memorialized in Procedural Orders 1-4.

In their respective motions, the Parties now seek broader relief. On August 8, 2025, Respondent filed a Motion for Summary Disposition as to Claimants' First Cause of Action for Breach of Contract and Fourth Cause of Action for Declaratory Relief. On August 22, 2025, Claimants filed an Opposition to Respondent's Motion for Summary Disposition and Cross-Motion for Summary Disposition on Causes of Action 1 and 4. On August 29, 2025, Respondent filed a Reply in Further Support of its Motion.

On August 8, 2025, Claimants filed a Motion for Sanctions and/or to Dismiss Respondent's Counterclaims on the Merits. On August 22, 2025, Respondent filed Opposition to Claimants' Motion and, on August 29, 2025, Claimants filed a Reply in Support of their Motion. Additional letters regarding Claimants' assertion of additional misconduct by Respondent supporting sanctions and/or dismissal of Respondent's counterclaims were submitted by Claimants on September 15, 2025, and Respondent on September 17, 2025. On October 21, 2025, the Panel heard Oral Argument on both sets of Dispositive Motions.

The Panel has read and considered the Parties' dispositive motion filings, oral arguments, and cited authorities. This Interim Award is based solely upon the Panel's review of the Parties' submissions and applicable law and is not a reflection of the quality of the Parties' respective presentations.

II.    Discussion

Legal Analysis

For purposes of the Motions for Summary Disposition, the Panel has considered the contrary legal interpretations of the language contained within the License Agreement as argued by the Parties and the legal basis for the counterclaims advanced by Respondent and concludes, as follows.

The parties entered into the License Agreement on May 23, 2023. Pursuant to the License Agreement, Saber acquired from the NFLPA Licensors the right to include NFL   players' names, images, likenesses and jersey numbers in an arcade-style football   video game, "Wild Card Football", which was published by Saber. In exchange for the right to use the NFL Intellectual Property, Saber committed to pay the NFLPA Licensors royalties based on the sales of the game, subject to "Minimum Guarantee Payments", as well as minimum "Marketing Commitments" of funds by Licensee Saber for activations and endorsements performed by NFL players in support of the Licensed Product.

Section 1.B of the License Agreement defines the Term of the Agreement and provides, ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

6

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████ (Emphasis in

original).

Section 2.A of the License Agreement defines Minimum Guarantee Payments

owed and contains a chart setting forth each of the three License Periods, the required

amounts and their due dates. It provides, ████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ (Emphasis Added).

A Minimum "Marketing Commitment" of funds owed by Licensee Saber to the

NFLPA Licensors for activations and endorsements performed by NFL players in

support of the Licensed Product is defined in Section 2.C of the License Agreement,

which also contains a chart setting forth each of the three License Periods, the required

amounts and their due dates. Section 2.C provides, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

(Emphasis Added).

Section 8.B of the License Agreement defines the "Effect of Termination." It Provides in relevant part, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (Emphasis Added).

Respondent contends that it does not owe Claimants any additional "Minimum Guarantee Payments", or minimum "Marketing Commitments". Respondent argues that the Minimum Guarantee relates only to each specific time period (the "License Period") and not to the entire "Term" of the License Agreement. Respondent then concludes that it does not owe any additional Minimum Guarantee payments for the Third License Period, which occurred after Claimants terminated the License Agreement.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning its terms." "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous."*Greenfield v. Philles Records., Inc.,* 98 N.Y.2d 562, 569 (2002). (Internal citations omitted). "A court should not read a contract so as to render

any term, phrase, or provision meaningless or superfluous." *Givati v. Air Techniques,* 104 A.D. 3d 644, 645 (2nd Dept. 2013).

The Panel rejects Respondent's strained interpretation of the License Agreement. When Respondent breached the License Agreement by failing to make payments, Claimants properly exercised their right and terminated the License Agreement. The contract provides that, upon termination, ████████████ ████████████████████████████████████████████ ██████████████████████ (License Agreement, Section 8.B "Effect of Termination") (Emphasis Added). All future payment obligations, which included ████████████ ████████████████████████████████████████████, were accelerated and ████████████████████.

Respondent erroneously contends that it is excused from making Marketing Commitment payments for the Third License Period because it was precluded from selling the Licensed Product during that Period. Its obligation became due and payable upon entering the License Agreement and it was Respondent's own breach that resulted in termination and its inability to sell the Product. Likewise, Respondent misreads the concluding sentence of Section 8. B of License Agreement. The earlier acceleration language in Section 8.B relates to monies that ████████████████ ████████████████████ by Licensee following termination by Licensor. In contrast, the concluding sentence in Section 8.B relates to ████████████████ ████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████████

██████████ (Emphasis Added).

The Panel therefore grants Claimants' Motion for Summary Disposition with respect to its breach of contract claim and denies Respondent's motion to dismiss Claimants' first cause of action for breach of contract.

In counterclaims, Respondent asserts that regardless of the License Agreement's "Minimum Guarantee Payments", "Marketing Commitment" and "Effect of Termination"provisions, Respondent should be awarded recission of the License Agreement and the return of all funds previously paid pursuant to the License Agreement due to Claimants' alleged Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, and Fraud in the Inducement. Specifically, Respondent argues that Claimants breached the License Agreement and the implied covenant of good faith and fair dealing by unreasonably and without justification refusing to allow Respondent to place certain "features" into the video game product. Additionally, Respondent asserts that it was fraudulently induced to enter the License Agreement based on alleged statements by Claimant representatives that "wrestling style tackle moves" were their only concern. By Motion, Claimants move to have Respondent's counterclaims dismissed as a sanction for discovery misconduct or, in the alternative, for the counterclaims to be dismissed on the merits as a matter of law.

Although the Panel is troubled by Respondent's Discovery efforts and production, the Panel grants Claimants' Motion to Dismiss Respondents' Counterclaims, on the Merits as a matter of law. This renders moot Claimants' alternative ground to grant its motion as a Discovery sanction.

10

In its Amended Response, Respondent acknowledges that the "material" restriction imposed by Claimants was "eliminating the 'helmetless' option." (Amended Response, Para. 22).  Indeed, contemporaneous emails between the Parties confirm that the restrictions at issue and for which Respondent was seeking approval to include in the video game concerned game violence. In the email correspondence, Claimants were criticized for trying to make the game "a case study in head trauma" and "remov[ing] all of the 'fun elements.'" Disputed game elements were referenced by Respondent as "comically over-the-top gameplay and animations that we believed critical to the success of the game." (July 1, 2025, Letter, Ex. 2,3).

Pursuant to their License Agreement, the Licensed Product was an Arcade Style Action Simulation Game, which was defined as a ███████████████████████████ (License Agreement 1.A.ii). Respondent agreed that ██████████████████████ ████████████████████████████████████████████████████████ and that ████████████████████████████████████████████████████████ ███████████████████████████████████████ (License Agreement 1.A.iii). <u>Respondent further</u> ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ (License Agreement 1.A.iii). Critically, Respondent was required to ███████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ (License Agreement 6.A). (Emphasis Added).

The Panel recognizes that the mere contractual granting of sole discretion does not permit a party to act unreasonably and in bad faith. Here, however, the disputed game elements that Respondent sought to obtain Claimants' approval for were expressly within the plays and behavior prohibited by the License Agreement. Helmetless play is not "realistic" and, for the players, would result in "excessively violent hits, including to the head." Claimants were well within the rights granted them in the License Agreement when they declined to approve game elements that they believed raised player safety concerns, could result in "head trauma", and constituted, in Respondent's own words, "over-the-top gameplay and animations."

"The implied covenant of good faith and fair dealing is a pledge that neither party to a contract shall do anything which would have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct. However, no obligation may be implied that would be inconsistent with the other terms of the contractual relationship." *Wymara, Ltd. V. Gansevoot Hotel Grp.,LLC*, 241 A.D. 3d 1611, 1613 (2nd Dept. 2025) (Internal citation and quotations omitted). Accordingly, Respondent's counterclaim for breach of the implied duty of good faith and fair dealing is dismissed.

Respondent has also asserted a claim for fraudulent inducement. Saber contends it was fraudulently induced to enter into the Licensing Agreement  because it was told that Claimants' only concern was the depiction of wrestling style tackling moves, and withheld that they intended to deny approval of other game elements.

12

Saber argues that had it been told of other restrictions, it would not have entered into the Licensing Agreement. See, Saber Amended Response, Para.12-14.

Contrary to Claimants' contention, even where a contract contains a merger clause it does not preclude a claim of fraudulent inducement. N.Y. Fruit Auction Corp. v. City of New York, 81 A.D. 2d 159, 166 (1st Dept.1981) ("It should be noted that 'merger' or 'integration' clauses do not ordinarily prevent a party from showing fraud in the inducement."), aff'd, 56 N.Y.1015 (1982).

Nonetheless, Saber's fraudulent inducement claim fails as a matter of law because it is dependent upon statements (or withheld statements) that directly contradict  terms in the Licensing Agreement.  As discussed, the Agreement explicitly prohibits ███████████████████████████████████████ █████████████████████ (License Agreement 1.A. iii).  The Agreement also gives Claimants ████████████ to determine whether any depictions are excessively violent. Claimants' primary objection to the proposed video involved helmetless players, which would clearly expose the them to violent hits to the head.  Because the basis on which Respondent claims to have been falsely induced to enter into the Agreement is in direct contravention of  the explicit terms of the Agreement, the fraudulent inducement claim fails as a matter of law.  See, e.g., *Shah v. Mitra*, 171 A.D.3d 971, 978-79 (2d Dept. 2019) (affirming dismissal of fraudulent inducement counterclaim where claims of fraudulent inducement "are flatly contradicted by the terms of the agreement"); Bango v. Naughton, 184 A.D.2d 961, 963 (3rd Dept.1992) ("the conflict between the provisions of the written contract and the oral representations negates the claim of reliance upon the latter").

III.     Conclusion

As set forth above, Claimant's Motion for Summary Disposition is granted with respect to its breach of contract claim addressing Respondent's failure to meet its payment obligations under the Agreement. The precise amount of payments due shall be set forth in a Final Award after further submissions from the Parties. Claimants' motion to dismiss Respondent's counterclaims is also granted.

This INTERIM AWARD is in full settlement of all claims submitted to this Arbitration Panel in, and as limited to, the Parties' JAMS Comprehensive Rule 18 Motions for Summary Disposition. The only matters that remain for decision relate to Claimants' contention that Respondent violated Claimants' intellectual property rights when it continued to display licensed material after the Agreement was terminated, and the damages Claimants incurred as a result of Respondent's breach of the License Agreement. The further determinations to be made at any further Hearing or based on written submissions shall be embodied in a Final Award which shall also incorporate the contents of the Interim Award. This Interim Award is not subject to court review.

Dated: November 11, 2025

Caroline Antonacci, Arbitrator and Chair

Dated: November 11, 2025

Vivien Shelanski, Arbitrator

Dated: November 11, 2025

Hon. Theodore Katz (Ret.), Arbitrator

14